# IN THE COURT OF APPEALS OF IOWA

No. 21-1262
Filed January 27, 2022

**IN THE INTEREST OF K.S.,**
**Minor Child,**

**A.S., Mother,**
 Appellant.
_____

Appeal from the Iowa District Court for Winneshiek County, Linnea M.N. Nicol, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Nicholas E. Hay of Hay Law, P.L.C., Decorah, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Whitney L. Gessner of Gessner Law Office, Postville, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

A mother, Amanda, appeals the termination of her parental relationship with her fourteen-year-old daughter, K.S. She challenges the statutory ground for termination, contending K.S. could have been returned to her custody under Iowa Code section 232.116(1)(f) (2021). In the alternative, Amanda asks for an extension of time to work toward reunification. She also argues termination is not in K.S.'s best interests and the Iowa Department of Human Services (DHS) did not make reasonable efforts when it failed to hold family team meetings for two months. Finally, Amanda contends the juvenile court abused its discretion in excluding evidence of the foster mother's mental-health history.

After reviewing the full record, and giving due deference to the views of K.S.'s therapist and other service providers, we agree that K.S. was likely to suffer harmful effects if returned to Amanda's care. *See* Iowa Code §§ 232.102(4)(a)(2); 232.2(6). And finding no merit in the mother's other claims, we affirm the termination order.[1]

---

[1] We review termination proceedings de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). We give "respectful consideration" to the juvenile court's fact findings, especially on credibility calls, but are not bound by them. *Id.* The petitioning party, here the guardian ad litem (GAL) must prove its allegations by clear and convincing evidence. *See id.* That standard means we harbor no serious or substantial doubts about the correctness of the conclusions of law that the juvenile court draws from the evidence. *See id.* As for Amanda's evidentiary challenge, we review that ruling for an abuse of discretion. *See In re N.N.,* 692 N.W.2d 51, 54 (Iowa Ct. App. 2004).

## I.      Facts and Prior Proceedings

This appeal is the second time Amanda has contested the termination of her parental rights.  In her first appeal we offered this procedural history:

> In late December 2016, Wisconsin authorities responded to allegations that K.S. and [her older sister] S.K. were physically fighting and the mother failed to intervene or address the situation. Because of this incident, the mother was arrested and criminally charged with neglect.  Those charges were dismissed.  But a no-contact order was entered between K.S. and S.K.  And K.S. was placed in her father's custody.  He lived in Iowa.
> In May 2017, the [DHS] removed K.S. from the father's home based on concerns the father committed domestic abuse on his paramour and used illegal drugs.  In August, the juvenile court adjudicated K.S. as a child in need of assistance (CINA) as defined in Iowa Code section 232.2(6)(c)(2) and (n) (2017).  K.S. was placed with a foster family in Iowa.
> In February 2019, the State filed a petition for termination of parental rights.  In July, the juvenile court issued an order terminating both parents' rights.  The court concluded grounds for termination existed under Iowa Code section 232.116(1)(d) and (f) (2019).

*In re K.S.*, No. 20-0354, 2020 WL 4499051, at *1 (Iowa Ct. App. Aug. 5, 2020).[2]

In assessing whether the State met its "heavy evidentiary burden," we emphasized that neither the State nor the GAL pointed to evidence that Amanda's home was not safe for K.S.  *Id.* at *3.  We expressed concern that Amanda had attended few in-person visitations but noted the difficult logistics of interstate travel between the foster home in northeast Iowa and the mother's home in Green Bay, Wisconsin.  *Id.*  Ultimately, we concluded that Amanda's visitation record did not provide clear and convincing evidence that K.S. could not be safely returned to her care.  *Id.*  Because the State did not meet its burden, we reversed.

---

[2] The father did not appeal the termination of his parental rights.

On remand, the juvenile court ordered the DHS to draft "an updated and modified case plan detailing the issues that must be addressed for the mother to regain custody of the child." Under that plan filed in September 2021, Amanda and K.S. were to have Wednesday night phone calls, attend family therapy and monthly family team meetings, and have in-person visits every two weeks.[3] Both the GAL and the court-appointed special advocate (CASA) reported that K.S. was upset by the appellate reversal of the termination order because she wanted to be adopted by her foster mother, Shauna. Consistent with the child's preference, the CASA reported that K.S. had been thriving in the structure provided in Shauna's home. But K.S. also told the CASA that she *did* want to have visitation with Amanda, as long as it was supervised.

Amanda also filed a report with the court in late September, expressing skepticism that the DHS was "actually working toward reunification." The mother's report stated: "Based upon the history of the case and every other team member allowing the child to dictate her own placement regardless, it is the mother's position that reunification is not a legitimate and realistic goal of the Department." Although Amanda asserted supervision was unnecessary, she agreed to participate in the supervised interactions offered by the DHS. As for other services, Amanda requested an interstate compact home study and family therapy.

After holding a permanency hearing, the court issued an order in early October outlining the next steps in the case. That order directed the DHS to facilitate four services: (1) an expedited home study at Amanda's new apartment

---

[3] The DHS offered to help defray the costs of weekly visits. But citing her other children and the long drive, Amanda chose to schedule visits every other week.

in Green Bay, Wisconsin; (2) family therapy, per Amanda's request; (3) supervised visitation between Amanda and K.S. in Iowa, and (4) "monthly family team meetings to assist the team in staying on track to assess safety and risk issues regarding placement of the child in the home of her mother."

Over the next two months, the DHS provided three of the four services mandated by the juvenile court. It arranged supervised visitation in Iowa every other weekend and paid for Amanda's gas and lodging. It offered joint therapy sessions for Amanda and K.S. as well as individual counseling for K.S. And it coordinated a home study with its counterparts in Wisconsin. But because of administrative issues, the DHS failed to hold family team meetings in October and November.

Despite the provision of these services, the progress toward reunification was limited. Amanda and K.S. had phone contact, though Amanda missed some scheduled calls. Amanda regularly made the drive from Green Bay to northeast Iowa for supervised visitations, though she cancelled a late November interaction because of recent Thanksgiving travel to see an ailing family member. Also during this time, the mother and daughter engaged in therapy but struggled to connect. According to K.S.'s therapist Nicole Brevig, in their joint sessions Amanda failed to acknowledge her daughter's trauma.

The Wisconsin home study approved Amanda's residence—with conditions. Those conditions included "a minimum of six months of stable placement" before the Iowa DHS closed its case. The author also expressed reservations about the placement with Amanda because she had allowed "a 20-year-old felon" to stay in her apartment for a few weeks. The author acknowledged

that Amanda "did require the man to move out" but believed that the incident "speaks to her decision making regarding who her children are exposed to in the home." The Wisconsin worker then questioned why K.S. was not allowed to visit Amanda's home and her siblings "to see if placement is even wise at this point."[4]

Another complication occurred in October 2020. The Iowa DHS removed K.S. from her long-time placement because her foster mother, Shauna, had been using marijuana daily to cope with mental-health issues. K.S. stayed with Shauna's mother for about six weeks before returning to her foster home.

Then in mid-December, just ten weeks after the new case plan launched, the GAL petitioned to terminate Amanda's parental rights. After a second termination trial, the juvenile court terminated Amanda's parental rights under section 232.116(1)(f). Amanda now appeals.

## II. Analysis

### A. Statutory Grounds

We start with the elements of paragraph (f):

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

---

[4] Amanda had custody of two older daughters, sixteen-year-old S.K. and seventeen-year-old I.M., who are K.S.'s half-sisters. The record shows a history of physical aggression between K.S. and S.K., who has been diagnosed with autism. But K.S. and S.K. had positive interactions during Amanda's visits to Iowa in 2020. I.M. also struggles with mental-health issues, including hospitalization for an eating disorder. The CASA acknowledged that Amanda has done a good job of accessing services for her older daughters.

(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Amanda concedes elements (1) through (3), but contests element (4).[5]  She contends the GAL failed to prove by clear and convincing evidence that "returning K.S. to her mother's care would subject K.S. to some adjudicatory harm under Iowa Code [section] 232.2(6)(c)(2) and (n)."

As Amanda suggests, the GAL's proof of that element is not overwhelming.  Some evidence supports Amanda's claim that she can resume care of K.S.  For instance, Amanda has been an attentive parent to her two daughters in Wisconsin, providing adequate care and supervision.  *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) ("[E]vidence of the parent's past performance . . . may be indicative of the quality of the future care that parent is capable of providing." (citation omitted)).  And since her first appeal, Amanda has shown commitment to K.S.  True, those efforts weren't perfect.  But we find her affection for K.S. and her desire to reunify are genuine.

---

[5] Our case law offers two formulations for what it means that a child "cannot be returned" to parental custody as provided in section 232.102 (discussing transfer of a child's legal custody if continuation in the child's home would be "contrary to the welfare of the child").  Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992) which quotes section 232.102(4)(a)(2) (2021) [then numbered as section 232.102(5)(b)] for the proposition that custody should not be transferred unless the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available."  *See, e.g.*, *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016) (considered *en banc*).  But more recent cases observe that our supreme court often describes that element simply as the inability to "safely return" children to their parents' care.  *See, e.g.*, *In re T.W.*, No. 20-145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases).  Under either articulation, we find the GAL met its burden of proof.

Trouble is, time is not on Amanda's side. K.S. has been out of Amanda's home for nearly four years. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (treating cases where children have been out of parental care beyond the limitation period "with a sense of urgency"). After so much delay, returning to Amanda's custody would cause K.S. harm amounting to a new CINA adjudication, so we affirm. *See* Iowa Code §§ 232.116(1)(f), 232.2(6)(*l*) (defining a child in need of assistance as unmarried child "[w]ho for good cause desires to have the child's parents relieved of the child's care and custody"); *see also In re I.N.*, No. 20-0793, 2020 WL 5651595, at *5 (Iowa Ct. App. Sept. 23, 2020) (considering all relevant CINA adjudication factors when reviewing paragraph (f)'s "adjudicatory harm" requirement).

In the years since her removal, K.S. has built a life with her foster family. She has no desire to uproot and move to Wisconsin now.[6] She sees Shauna as her mother. To remove her from her foster home would undoubtedly traumatize K.S.[7] *See generally In re R.S.*, No. 15-12444, 2015 WL 5578273, at *2 (Iowa Ct. App. Sept. 23, 2015) (recognizing trauma caused when child is removed from foster family after a bond developed). Indeed, since we reversed the first

---

[6] In response to Amanda's first appeal, K.S. asked her mother, "If I am happy here, why do you want to ruin my happiness?" And, after we reversed, K.S. informed the CASA of her "goal to not ever live with [Amanda]."

[7] We recognize that our supreme court recently observed: "A child's anxiety over the transition from one home to another does not rise to the level of significant emotional harm that would rebut the parental presumption in favor of reuniting the child with the parent." *In re Guardianship of L.Y.*, ___N.W.2d ___, ___, No. 20-1034, 2022 WL 127956, at *12 (Iowa Jan. 14, 2022). But that observation was in the context of deciding to uphold the termination of a guardianship where the parent had not been adjudicated as unfit. By contrast, this case started with a CINA adjudication stemming from Amanda's failure to provide adequate supervision for her daughter.

termination, Shauna and K.S.'s therapist noted a decline in the child's spirits. And this decline has manifested in her academics—her grades slipped and her concentration took a turn for the worse.

What's more, K.S. worries about Amanda's ability to care for her. K.S. acknowledges her struggles with mental health and the inappropriate ways she sometimes deals with strong emotions. But she also recognizes her growth, which she credits in significant part to Shauna. From there, K.S. fears she won't get the same level of support with Amanda.[8] And she's not the only one concerned. Therapist Brevig had seventeen sessions with K.S. in the fall of 2020, eight of which were joint sessions with Amanda. Brevig testified that Amanda failed to acknowledge that K.S. was "still processing a lot of things that happened in the past." According to Brevig, Amanda's refusal to work on K.S.'s past traumas prevented the "rebuilding process." Brevig quoted Amanda as telling K.S. that "you just need to put the past in the past" when the girl "was trying to get across" how upset she was by a missed call with Amanda on Christmas. Brevig also observed

---

[8] In lieu of testifying during the termination trial, K.S. wrote a letter to the court stating:

> I know people here that I can trust and will take care of me and will listen to my feelings and what I say. I know that my future will be more successful. I know that my mental health is going to be better than it was when I was with Amanda. I don't want to have to scream, kick, or fight and have meltdowns because people don't care about how I feel. I don't want to be depressed or put in a mental hospital again either. . . . I just want to keep being able to have my happy life here with my [foster] family. I have been ready to be adopted for a long time. I don't want any more appeals. I just want to be happy.

that Amanda failed to "internalize" the depth of K.S.'s disappointment when Amanda did not live up to her promises.[9]

In rebutting the GAL's case, Amanda attributes the recent deterioration in K.S.'s mental health to the foster mother, noting the month-long period during which Shauna's foster license was revoked for marijuana use. Amanda acknowledges that "K.S. was dealing with increased anxiety" in the fall of 2020. But she downplays it, contending it was "manageable" through coping skills.

After our de novo review, we share the GAL's concern that K.S. would regress if returned to Amanda's care. That's not to say that we don't appreciate Amanda's commitment to family therapy and to seeking services for K.S. if she were integrated into the Green Bay home with her sisters. We also applaud the support she gives her older daughters. But as the juvenile court recognized, "all [K.S.'s] coping skills are built around her current placement." For example, K.S. values her foster mother's listening skills. And K.S. has developed "a consistent group of school friends" in Iowa. By contrast, Amanda has been unable to reassure K.S. that she would be safe and supported at Amanda's home. On this record, K.S.'s concerns for her mental health are legitimate. Amanda's mindset that K.S. should forget the damage inflicted by her absentee parenting and move on bodes poorly for reunification.

---

[9] Others have voiced concern as well. The GAL highlighted testimony from DHS worker Darla Jones who believed that K.S.'s mental health required a level of engagement that Amanda was not prepared to provide. "It is significant to us that neither the third-party service providers nor the GAL believed [K.S.] could be safely returned to [Amanda] at the time of trial." *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014).

We also consider how sexual abuse allegations factor into K.S.'s mental health. In February 2020, Amanda allowed a young man named Jacob, whom she barely knew, to move into the family's apartment in February 2020.[10] S.K. later accused Jacob, who had a felony conviction, of touching her inappropriately. And after reporting this abuse, S.K. revealed that her biological father, while living under Amanda's roof, had also abused S.K. years before. After all the allegations came to light, K.S. expressed concern that it might happen to her.

Exposing her teenage daughters to a dangerous stranger revealed a serious lapse in Amanda's judgment. We share the juvenile court's view that by "allowing men to be unsupervised around her vulnerable daughters," Amanda has fueled K.S.'s fears about the lack of parental judgment. And these fears are apt to exacerbate her mental-health concerns.

Given K.S.'s concern for her mental health, shared by third-party service providers; Amanda's poor judgment; and K.S's desire for termination and adoption; we find clear and convincing evidence that K.S. could not be safely returned to Amanda's care.

**B. Delayed Permanency**

As an alternative to termination, Amanda urges the juvenile court should have granted her more time to reunify with K.S. To grant a parent's request for a delay in permanency, the record must convince the court "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). When considering a delay, the

---

[10] True, Amanda took action to have him removed from the apartment. But it was only after Wisconsin authorities intervened.

court must remember "if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home." *In re A.A.G.*, 708 N.W.2d 85, 92–93 (Iowa Ct. App. 2005).

We see no viable plan for reunification. Nothing in the record suggests that Amanda could regain K.S.'s trust in the next six months. By the time of the second termination hearing, K.S. had been out of parental custody for nearly four years. The parties agree that postponing permanency has already caused K.S. to experience a deterioration in her mental health. Another delay would only compound that stress.

### C.      Best Interests

Amanda next argues that termination of her parental rights is not in K.S.'s best interests. In assessing best interests we consider the child's safety, the best placement for furthering the child's long-term nurturing and growth, as well as the child's physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). We may also consider the child's integration into her foster family. *See In re J.B.L.*, 844 N.W.2d 703, 706 (Iowa Ct. App. 2014); *see also* Iowa Code § 232.116(2)(b)(1). Security and the need for a permanent home mark the "defining elements" in a child's best interests. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

In her best-interests argument, Amanda avoids a discussion of her own strained relationship with K.S. Instead, she asserts that "the recent conduct of the foster mother throws into question the long-term stability of K.S. in the prospective adoptive home of the foster mother." The record rebuts that assertion. The foster

mother's use of marijuana for a few months during the pandemic to cope with anxiety did not affect the prospect of her adopting K.S. To that end, DHS worker Jones testified that Shauna completed a "corrective action plan" and was again considered a safe and stable placement for K.S. What's more, in letters to the court, K.S. expressed her desire to stay with her foster mother because "Shauna made [her] feel loved." Moving toward adoption is in K.S.'s best interests.

### D.     Reasonable Efforts

The DHS must "make every reasonable effort" to return children home as quickly as possible consistent with their best interests. Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d at 493. We focus on the services provided and the parent's response, not on the services the parent now claims the DHS failed to provide. *Id.* at 494.

In contending that the DHS did not make reasonable efforts toward reunification after we reversed the first termination order, Amanda cites its failure to hold two family team meetings scheduled for the fall of 2020. The juvenile court rejected that claim, explaining: "Even though family team meetings were not held in October and November 2020, the [DHS] through their service providers, assisted the mother by paying for hotel stays and transportation for visits. The mother was not denied support for visitation or family counseling due to the reduced number of family team meetings." We agree with the juvenile court's reasoning.

### E.     Evidentiary Issue

During the termination trial, the juvenile court allowed Amanda's attorney to ask Shauna, the foster mother, about her current mental-health concerns. But the

court ruled that her mental-health history was irrelevant. Amanda now argues that ruling was an abuse of discretion. Amanda notes that Shauna testified that she had struggled with her mental health for at least a decade. Probing that history further, according to Amanda, was relevant to K.S.'s removal from Shauna's care within sixty days of the termination trial.

Evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact is "of consequence in determining the action." Iowa R. Evid. 5.401. Generally, relevant evidence is admissible. Iowa R. Evid. 5.402.

We disagree with Amanda's position. The details of the foster mother's mental-health history were not consequential in determining the outcome of the termination trial. So the juvenile court did not abuse its discretion in limiting cross-examination by the mother's attorney.

**AFFIRMED.**